# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ROBERT HILDEBRANDT**
**Plaintiff,**

**v.**                                                    **Case No. 11-C-0739**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
**Defendant.**

---

## DECISION AND ORDER

Plaintiff Robert Hildebrandt applied for social security disability benefits, alleging inability to work due to back pain and depression. The Social Security Administration ("SSA") denied his claim initially and on reconsideration (Tr. at 69-72), as did an Administrative Law Judge ("ALJ") after a hearing (Tr. at 10-19). The Appeals Council then denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the Commissioner's final word on the matter. See Jelinek v. Astrue, 662 F.3d 805, 807 (7th Cir. 2011). Plaintiff now seeks judicial review of the ALJ's decision.

## I. APPLICABLE LEGAL STANDARDS

### A.    Judicial Review

A reviewing court will uphold an ALJ's decision if it is supported by "substantial evidence" and based on the proper legal standards. Id. at 811 (citing 42 U.S.C. § 405(g); Castile v. Astrue, 617 F.3d 923, 926 (7th Cir. 2010); Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009)). Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Schaaf v. Astrue, 602 F.3d 869, 874 (7th Cir. 2010). Under

this deferential standard, if conflicting evidence in the record would allow reasonable people to differ as to whether the claimant is disabled, the court will affirm the ALJ's decision. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008). The court must nevertheless conduct a critical review of the entire record, ensuring that the ALJ adequately discussed the issues and built an accurate and logical bridge from the evidence to the result. McKinzey v. Astrue, 641 F.3d 884, 889 (7th Cir. 2011). A decision denying benefits need not contain a discussion of every piece of evidence in the record, but when the ALJ fails to support her conclusions adequately, remand is appropriate. Jelinek, 662 F.3d at 811 (citing Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009)). The court limits its review to the reasons articulated by the ALJ in the written decision; post-hoc arguments from the Commissioner's lawyers may not be employed to save a flawed decision. See, e.g., Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010).

## B.    Disability Standard

Disability under social security law is determined under a sequential, five-step test. Weatherbee v. Astrue, 649 F.3d 565, 568-69 (7th Cir. 2011) (citing Craft v. Astrue, 539 F.3d 668, 673 (7th Cir. 2008)). The first step considers whether the claimant is currently working, i.e., engaged in "substantial gainful activity" ("SGA"). Step two considers whether the claimant suffers from a severe, medically determinable physical or mental impairment. The third step compares the claimant's impairment(s) to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the claimant is deemed disabled; if not, the evaluation continues. The fourth step assesses the claimant's residual functional capacity ("RFC") and ability to engage in past relevant work. If the claimant cannot engage in past relevant work, the evaluation proceeds to the fifth step and an assessment of whether, given his RFC, age, education, and work experience, the claimant can

engage in other work. If not, he will be found disabled. Id. at 569.

The claimant bears the burden of proof in each of the first four steps. Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). If he reaches step five, the burden shifts to the Commissioner to present evidence establishing that the claimant possesses the RFC to perform other work that exists in a significant quantity in the national economy. Weatherbee, 649 F.3d at 569 (citing Liskowitz v. Astrue, 559 F.3d 736, 740 (7th Cir. 2009)). The Commissioner may at step five rely on a vocational expert's assessment of the types of occupations in which the claimant can work and the availability of positions in such occupations. Id.

## II. FACTS AND BACKGROUND

### A. Plaintiff's Applications

Plaintiff filed his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") in February 2009, alleging a disability onset date of August 30, 2006. (Tr. at 142.) In an accompanying disability report, he claimed that he was unable to work due to back and neck pain, which limited his ability to lift, stand, and sit. (Tr. at 170.)

### B. Medical Evidence

#### 1. Treatment Records

Plaintiff related his disability to an August 30, 2006, motor vehicle accident in which he was rear-ended by another car. Medical records indicate that he visited the emergency room four or five hours after the accident, complaining of lower back pain. On examination of his back, Dr. David Sadler noted no evidence of abrasions, redness, or swelling, but plaintiff did have minimal pain across mainly his right lower lumbar region. He was able to do straight leg

raises and toe and heel walk.  (Tr. at 218.)  Dr. Sadler diagnosed an acute lumbar strain, muscular in nature, and provided Flexeril and Ibuprofen.  (Tr. at 218-19.)

On September 7, 2006, plaintiff saw Randy Purcell, PA-C, complaining of neck pain. He indicated that at the time of the accident, his neck did not hurt all that much but over the last day or two it had stiffened up.  He had not used the muscle relaxer provided by the hospital, as he had to drive for his job.  On examination, he had some decreased range of motion and tenderness to the muscles of the upper neck.  (Tr. at 430.)  PA Purcell ordered a cervical spine x-ray, which came back negative (Tr at 428, 773), and diagnosed a cervical sprain/strain, providing medication and a home exercise program (Tr. at 430).

Plaintiff returned to PA Purcell on April 17, 2007, complaining of low back pain for the past month to six weeks, which he related to the August 30, 2006, car accident.  The pain was worse with walking, and home exercises and stretching did not help.  On examination, L4, L5, S1 testing was intact, and straight leg raising was negative with the exception of some tight hamstrings.  X-rays of the lumbar spine were unremarkable, showing only mild narrowing of the L1-2 and possibly the L5-S1 discs, with no acute fracture.  (Tr. at 422, 424.)  PA Purcell assessed low back pain, likely of mechanical origin, and provided a home exercise program and arranged a chiropractic evaluation.  He also recommended use of Naproxen for several weeks.  (Tr. at 422.)

Later that month, plaintiff initiated treatment with a chiropractor, Dr. Thomas Siegel, regarding his low back pain.  Dr. Siegel assessed "ill-defined lumbar spinal dysfunction" (Tr. at 293) and treated plaintiff with manipulation and mechanical traction (Tr. at 294).  During subsequent visits with Dr. Siegel in April and May 2007, plaintiff noted some improvement in his condition.  (Tr. at 268-79, 281-89.)

4

On May 6, 2007, plaintiff visited the emergency room visit after he injured his left shoulder falling over the back of his couch. X-rays revealed an anterior dislocation but no fracture. (Tr. at 220.) Dr. Raymond Wallace performed manual direct manipulation, provided Motrin and Vicodin, and discharged plaintiff home. (Tr. at 221.) A May 7, 2007, x-ray revealed the shoulder was no longer dislocated. (Tr. at 418.) Dr. Eric Pifel recommended a course of physical therapy to improve motion and symptoms, but plaintiff declined medications. (Tr. at 420-21, 533-46, 768-69.)

On June 13, 2007, plaintiff saw Dr. Siegel regarding his low back pain, indicating that he had been feeling great since his last treatment and rating his pain 0/10. (Tr. at 266.) On June 18, 2007, plaintiff returned to Dr. Pifel for follow-up regarding his left shoulder dislocation, also doing very well with that problem. (Tr. at 414, 764.)

However, in late July 2007, plaintiff experienced a recurrence of low back pain (Tr. at 255-56, 260-264, 410-11, 761-62), and on August 10, 2007, he saw Dr. Thomas Perlewitz, an orthopedist, and his assistant, Laura Mays, PA-C, for evaluation. Dr. Perlewitz assessed L5-S1 disc degeneration with likely discogenic referred pain. He scheduled an MRI and enrolled plaintiff in a physical therapy program. (Tr. at 249, 252-53, 255-56.) An August 15, 2007, lumbar spine MRI showed mild degenerative changes. (Tr. at 529-30.) Plaintiff attended therapy from August 20 to October 8, 2007. He initially progressed very well, however, on his last visit he reported that he recently bent over to pet a puppy, felt a "pop" in his lower back, and experienced sudden onset of pain. He was referred back to Dr. Perlewitz and PA Mays for further follow-up and discharged from therapy. (Tr. at 242-43, 517.)

Around this time, plaintiff also complained of recurrent neck pain. X-rays of the cervical spine showed no fracture or subluxation. (Tr. at 245.) Plaintiff attended therapy for the cervical

5

spine in October and November 2007, attending five sessions, then missing the last three, and noting overall improved symptoms. (Tr. at 597-98, 601, 608.)

On November 13, 2007, plaintiff returned to Dr. Perlewitz for follow-up of his low back and neck pain. Plaintiff noted little relief from therapy and complained of trouble sitting and getting in and out of a car, and finding it more and more difficult to work. He noted that his insurance company had discontinued his low back therapy. (Tr. at 235.) He was referred for MRI scans and an EMG study. (Tr. at 236.) The EMG, performed on December 7, 2007, came back normal. (Tr. at 232.)

On January 2, 2008, plaintiff returned to Dr. Perlewitz, reporting clumsiness with his left hand and frequent tripping when walking. His insurance had denied the lumbar MRI, but he was referred for an MRI of the cervical spine. (Tr. at 230.)

On March 18, 2008, plaintiff saw PA Mays regarding his persistent neck pain, with no significant improvement over past year and a half. (Tr. at 228.) A cervical MRI completed on August 4, 2008, revealed mild multi-level cervical spondylosis with mild disc degeneration and uncovertebral spurs, but no significant narrowing of the spinal canal or neural foramina. (Tr. at 401, 593-94.)

On October 1, 2008, plaintiff recommenced chiropractic treatment with Dr. Eric Kirk, rating his pain at the time as 10/10. (Tr. at 394, 749.) Dr. Kirk assessed lumbar pain, radicular leg pain, and ill-defined cervical dysfunction, treating plaintiff with supportive manipulation. (Tr. at 395, 750.) In subsequent visits with Dr. Kirk, plaintiff reported less severe but persistent pain, primarily in the low back. (Tr. at 382, 385, 388, 734, 736, 738.) On October 15, 2008, plaintiff reported being sore after doing yard work (Tr. at 379, 732), and on October 29, 2008, terrible pain after working on his grandparents' house getting it ready for winter (Tr. at 373,

6

728). During visits in November 2008, he reported doing better with his exercises (Tr. at 367, 370, 724, 726), experiencing pain only at certain times, such as when the weather was bad (Tr. at 364, 722). However, in early December 2008 he advised Dr. Kirk that his pain was worse. (Tr. at 355, 358, 361, 716, 718, 720.) By later that month, the pain had somewhat improved. (Tr. at 343, 346, 349, 352, 708, 710, 712, 714.) He continued this up and down course in January and February 2009, reporting doing better some days, worse on others. (Tr. at 319, 322, 325, 328, 331, 334, 337, 340, 690, 692, 696, 698, 700, 702, 704, 706.) On February 4 and 6, he reported increased pain after sanding a car. (Tr. at 313, 316, 681, 683.)

On April 9, 2009, plaintiff saw Dr. Peeush Singhal, an orthopedist, regarding his back and neck pain. He reported being unable to work since the 2006 accident; chiropractic treatment gave some relief but physical therapy and a TENS unit did not help much. (Tr. at 464.) On exam, his gait showed a mild limp, but he was able to walk on heels and toes, squat and stand from a squatted position, and perform a tandem heel-toe gait without problems. His back was mildly tender to palpation, with no pain with hip range of motion. The straight leg raise test was negative. He displayed full cervical range of motion, with no significant cervical tenderness. Dr. Singhal noted that the 2008 MRI of plaintiff's cervical area showed mild disc bulging, and an MRI of the lumbar area from 2007 revealed disc dessication at L4-L5 and L5-S1, and a large right-sided L5-S1 disc herniation. However, the MRI scan did not account for his present symptoms, which included significant left lower extremity pain as well. (Tr. at 465.) Dr. Singhal provided treatment options, with back injections being the next step. (Tr. at 465-66.) However, prior to proceeding, Dr. Singhal ordered a new MRI. (Tr. at 466.)

On April 16, 2009, plaintiff returned to Dr. Singhal for follow-up after his recent lumbar MRI. He continued to have low back pain with some radiation into the bilateral posterior thighs.

His symptoms had improved over the past several days, but he got flare-ups with even the slightest movements on occasion. The MRI revealed a mild to moderate sized posterior disc bulge at L5-S1 with a left annular tear, as well as disc dessication and a moderate sized disc protrusion at T12-L1 with annular tear. (Tr at 460, 463, 589, 838.) Because he had not responded to physical therapy or medications, Dr. Singhal recommended an epidural steroid injection. (Tr. at 460.)

On May 8, 2009, plaintiff saw Dr. Steven Holcomb, his primary care physician, reporting trouble taking the garbage, which weighed about twenty pounds, out to the road. The injections recommended by Dr. Singhal had been denied by his insurance. (Tr. at 456, 670.) Dr. Holcomb continued plaintiff on Percocet and Cyclopenzaprine and switched him from Fluoxetine (Prozac) to Citalopram for treatment of depression. (Tr. at 457, 671.)

On June 23, 2009, plaintiff returned to Dr. Singhal, complaining of low back pain with some mid-back and neck pain. The recommended epidural injection had been rejected by insurance, but plaintiff was appealing that decision, which Dr. Singhal encouraged. (Tr. at 454.)

On July 8, 2009, plaintiff saw Dr. Holcomb for follow up of his back pain, continuing to have significant radicular symptoms with a quite limited activity level. Medications helped with pain control but made him somnolent. (Tr. at 452, 661.) Dr. Holcomb assessed degenerative disc disease with neuritis and spondylolis and switched plaintiff from Percocet to Oxycodone, with a retry of Naproxen. (Tr. at 453, 662.)

On July 17, 2009, plaintiff underwent an epidural injection with Dr. Joshua Levin (Tr. at 576-78), and on August 27, 2009, he followed up with Dr. Singhal, denying any improvement in his low back pain. Plaintiff wanted to consider surgery, but Dr. Singhal recommended a

lumbar discogram first. (Tr. at 551.) A September 3, 2009, discogram CT of the lumbar spine showed a Dallas grade 4 to 5 tear at L5-S1, with mild bilateral facet hypertrophic changes noted. (Tr. at 649, 841.)

On September 11, 2009, plaintiff saw Dr. Holcomb complaining of persistent back pain. He reported initially being intolerant of Oxycodone but was doing better with a lower dose. (Tr. at 647.) Dr. Holcomb refilled Percocet and stopped Oxycodone. (Tr. at 648.) On September 22, 2009, plaintiff reported continued significant interference with daily activities, as well as trouble with his temper and concentration. He reported having to use a pushcart to get around the grocery store and trouble with stairs. He could extend his back no more than 5 degrees and flex about 45 degrees. (Tr. at 645.) Dr. Holcomb diagnosed low back pain, severe degenerative disease, and lumbosacral neuritis, as well as adjustment disorder with depressed mood secondary to his medical condition. Dr. Holcomb provided a trial of Cymbalta. (Tr. at 646.)

On September 22, 2009, Dr. Holcomb prepared a medical assessment form, indicating that plaintiff was unable to cope with workplace stress and suffered from drowsiness/sedation as side effects of medication. Dr. Holcomb further indicated that plaintiff was unable to ambulate effectively on a sustained basis; could walk one block without rest or severe pain; sit continuously for one hour; stand continuously for forty-five minutes; sit and stand/walk a total of less than two hours in an eight hour workday; required six unscheduled breaks during a workday; could occasionally lift less than ten pounds, never more; could rarely twist and never stoop; and would be absent more than four days per month due to his impairments. (Tr. at 498-501.)

Plaintiff returned to Dr. Holcomb on December 3, 2009, reporting escalating back pain.

9

He reported no benefit from Neurontin and taking four Percocet per day. (Tr. at 638.) Dr. Holcomb discontinued Cymbalta, Naproxen, and Gabapentin, increased the number of Percocet available, and added extended release morphine. (Tr. at 639.) However, on December 29, 2009, plaintiff reported little benefit from the morphine, and he continued to use a significant amount of Percocet for pain relief. (Tr. at 635.) Dr. Holcomb noted that plaintiff walked with a careful gait, displaying pain behavior consistent with his reported symptoms, including when seen in the parking lot. (Tr. at 635-36.) Dr. Holcomb switched plaintiff from morphine to methadone. (Tr. at 636.)

Plaintiff returned to Dr. Holcomb on March 3, 2010, complaining of hip pain. (Tr. at 630.) X-rays were normal. (Tr. at 629.) On March 5, 2010, he complained of worsening pain, not well-controlled. He reported effects in his activity level, change in ambulation, change in household functions, and change in sleeping patterns. He also reported some somnolence with methadone, which was helping but far from adequate. (Tr. at 627.) Dr. Holcomb increased the methadone dosage. (Tr. at 628.)

On March 18, 2010, plaintiff complained of malaise and weight loss, as well as significant problems with use of methadone for pain relief, including not feeling like himself. (Tr. at 625.) Dr. Holcomb switched plaintiff from methadone to Oxycontin. Plaintiff also complained of trouble finding a surgeon because of the motor vehicle accident history. (Tr. at 626.) On April 25, 2010, plaintiff told Dr. Holcomb the change to Oxycontin improved mentation but his pain was still not well controlled. (Tr. at 621.)

On July 1, 2010, Dr. Holcomb prepared an excuse from work slip indicating that plaintiff had been unable to work since December 2006 and had no prospect of returning to work in the foreseeable future. Noting plaintiff's lack of income, Dr. Holcomb asked that plaintiff's disability

10

hearing be moved up to "avert financial collapse." (Tr. at 782.) In a report dated August 4, 2010, Dr. Holcomb re-affirmed the restrictions in the September 22, 2009 report. (Tr. at 822-32.)[1]

## 2. SSA Consultants

On May 1, 2009, Dr. Michael Baumblatt prepared a physical RFC assessment report, finding plaintiff capable of light work with no other limitations. (Tr. at 439-43, 446.) On review of the medical evidence and plaintiff's reports, Dr. Baumblatt found plaintiff's complaints of pain somewhat out of proportion with the objective findings. Taking his subjective reports into consideration in conjunction with rather benign objective findings, Dr. Baumblatt opined that plaintiff could sustain performing at the light level of work. Dr. Baumblatt noted plaintiff's 2007

---

[1]The record also contains a report from Dr. Holcomb dated May 31, 2011. (Tr. at 847-51.) Because this report post-dates the ALJ's decision, I need not address it further. See Eads v. Sec'y of the Dep't of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993) (noting that the correctness of an ALJ's decision depends on the evidence that was before her). Because plaintiff focuses on his physical problems in challenging the ALJ's decision, I have also omitted a full review of his mental health treatment records. (See Tr. at 685-88; 789-820.) In a June 4, 2010, mental impairment assessment form, plaintiff's counselor, Carol Lynn Reichardt, LCSW, indicated that she had seen plaintiff twice per month since March 5, 2009, diagnosing him with adjustment disorder with mixed emotions and conduct. She opined that plaintiff experienced severe fatigue based on prescribed medications, depressed mood, disturbed sleep, and pain, and that he would be unable to consistently complete a normal workday due to fatigue. (Tr. at 685, 833.) She further indicated that due to significant pain and exhaustion, plaintiff may have difficulty being patient with others. She estimated that he would miss more than four days per month because of "bad days." He would need unscheduled breaks three times per day due to his symptoms, including fatigue, need to isolate, and irritability. (Tr. at 686, 834.) She was unsure if he could maintain the attention/concentration needed to perform simple work tasks due to his medications. (Tr. at 687, 835.) Under the "B criteria" of the mental health Listings, she rated moderate limitation of activities of daily living; marked limitation of social functioning; and moderate limitation of concentration, persistence, and pace. (Tr. at 687-88, 835-36.) She indicated that his medications caused drowsiness/sedation and impaired concentration/attention. (Tr. at 688, 836.) The record also contains a March 25, 2011 report from Douglas Lyman, Ph.D, but this post-dates the ALJ's decision. (Tr. at 842-45.)

left shoulder dislocation, but this resolved well and did not create an additional restriction on plaintiff's functioning. (Tr. at 444.)

On July 29, 2009, Mina Khorshidi, M.D., completed a second physical RFC assessment form, also finding plaintiff capable of light work with no other limitations. (Tr. at 487-91.) Dr. Khorshidi wrote that plaintiff's claim to be able to lift no more than five pounds or walk one to two blocks was not consistent with the medical evidence. (Tr. at 494.)[2]

## C.     Hearing Testimony

### 1.     Plaintiff

At his August 10, 2010 hearing before the ALJ, plaintiff testified that he was forty years old and lived with girlfriend and two daughters, ages nine and thirteen. (Tr. at 41.) He indicated that he dropped out of school after the ninth grade and had not earned a GED, but could read and write. (Tr. at 41-42.) He testified to no current source of income but previously worked as a self-employed auto wholesaler from 2000 to 2006, which involved buying and trading vehicles from dealers, getting them ready for auctions, then traveling to auctions to make sales. On a typical day, plaintiff would spend about 50% of the time sitting, 50% standing. The work did not involve heavy lifting but a lot of driving. (Tr. at 42.) Before that, plaintiff worked as a car salesman for two dealerships and as a bricklayer and masonry worker. (Tr. at 42-43.)

Plaintiff testified that he was rear-ended in a car accident on August 30, 2006, after

---

[2]On July 29, 2009, Kyla King, PsyD, completed a psychiatric review technique form, concluding that plaintiff suffered from no severe mental impairment. (Tr. at 473.) Under the B criteria of the Listings, Dr. King found no restriction of activities of daily living, no difficulty in maintaining social functioning, and no episodes of decompensation, with mild difficulty in maintaining concentration, persistence, and pace. (Tr. at 483.)

which his physical problems progressed to the point where he could no longer work. (Tr. at 43.) Plaintiff described his pain as focused in the lower back, radiating down his legs, constantly present but at varying degrees of intensity. (Tr. at 44-45.) He testified that he took Oxycontin, Percocet, and Flexeril for pain, with the pills making him drowsy and unable to concentrate very well. (Tr. at 45.) Plaintiff testified to various other forms of treatment, including a TENS unit, injections, chiropractic, and physical therapy. (Tr. at 46.) Four different surgeons had recommended fusion surgery, but he had not undergone the procedure because of insurance issues and his pending lawsuit related to the accident. (Tr. at 46-47.) Dr. Holcomb had been his primary care physician for about ten years. (Tr. at 48-49.)

Plaintiff testified that during an average eight hour day, he typically laid down for about two to three hours due to pain. Medications, moving around, and lying down helped the pain; sitting too long or driving too far made it worse. (Tr. at 47.) The back pain also interfered with sleep, which affected his energy level during the day. (Tr. at 49.) He testified to having bad days about once per week, where he would not leave the house but instead laid down most of the day. (Tr. at 50.) Plaintiff reported past neck pain and cervical spine abnormalities, but those problems had largely resolved. (Tr. at 48.)

Plaintiff testified that he had recently attempted to go to a car show, something he did about once every six months since 2006. (Tr. at 50-51.) He indicated that he currently did very little work on cars. On a good day, he would sit and sand on a car, but he would usually "pay for it" later or the next day. (Tr. at 51.) He indicated that he had a car in his garage that he was trying to fix up for well over a year. His son, age twenty-one, helped. (Tr. at 51.)

Plaintiff testified that he saw a psycho-therapist for depression and pain management. He took Pristiq for depression, having used Sertraline, Cymbalta, and Prozac in the past.

13

When depressed, he stayed in the house.  (Tr. at 52.)

Plaintiff testified that his girlfriend did the grocery shopping and his kids and girlfriend did most of the housework.  (Tr. at 52-53.)  He did a few simple chores, like folding laundry or simple cooking.  He indicated that he was able to dress and groom himself without assistance. He indicated that he could sit for about an hour before he had to get up and walk around.  (Tr. at 53.)  He stated that he could stand for less than an hour before he had to sit, walk for about a block before he had to stop and rest, and lift maybe five to seven pounds.  (Tr. at 53-54.)

### 2.    Vocational Expert

The vocational expert ("VE"), Ronald Raketti, classified plaintiff's past work as an auto wholesaler and salesman as light, skilled work, and as a bricklayer as medium, skilled work. (Tr. at 61-62.)  The ALJ then asked a series of hypothetical questions, assuming a person of plaintiff's age, education, and work experience.  If the person were limited to light work, with no other limitations, he could not perform plaintiff's past brick mason job but could work in auto sales, as well as various other jobs.  (Tr. at 62-63.)  If the person were further limited to simple, repetitive, routine tasks, in a work environment with only occasional decision-making, occasional changes in work setting, no strict production quotas, no contact with the general public, and occasional interaction with supervisors and co-workers, he could not perform plaintiff's past work.  (Tr. at 63.)  However, he could perform other jobs such as assembler of small parts, assembly/machine tender, and order clerk.  (Tr. at 63.)  If the person was limited to sedentary work with no other restrictions, available jobs would include final assembly, call-out operator, and order filler.  Adding the same non-exertional limitations as in the second question would, the VE testified, have no effect on these jobs.  (Tr. at 64.)  However, if the person were limited in the manner set forth in Dr. Holcomb's report (Tr. at 847-50) (e.g., off-

14

task at least 15% of the time, limited to sitting/standing for no more than one hour continuously and less than two hours in a workday, absent more than four days per month) all competitive work would be precluded.  (Tr. at 64-66.)

**D.    ALJ's Decision**

On September 30, 2010, the ALJ issued an unfavorable decision. The ALJ first determined that plaintiff met the insured status requirements through December 31, 2009, and that he had not engaged in substantial gainful activity since August 30, 2006, the alleged disability onset date.  (Tr. at 12.)  The ALJ then determined that plaintiff suffered from the severe impairments of degenerative disc disease of the lumbar and cervical spine and depression, neither of which met or equaled a Listing.  (Tr. at 12-13.)

At step four, the ALJ found that plaintiff retained the RFC for light work, further limited to simple, routine, and repetitive tasks in a work environment requiring only occasional decision making or changes in work setting, no strict production quotas, no contact with the general public, and only occasional interaction with supervisors and co-workers.  (Tr. at 14.)  In making this finding,  the ALJ considered plaintiff's testimony of greater limitations based on pain and weakness, but found his statements not credible to the extent they varied from the RFC.  (Tr. at 14-15.)  The ALJ also considered the opinion evidence, assigning Dr. Holcomb's August 2010 report little weight because it was "not well-supported by the evidence." (Tr. at 16.)  The ALJ also afforded Dr. Holcomb's July 2010 report little weight, as it did not include a function-by-function assessment but rather focused on plaintiff's financial needs.  (Tr. at 17.)  The ALJ concluded that her RFC was supported by the substantial weight of the evidence, including the diagnostic evidence demonstrating only minimal findings, the physical examinations within normal limits, plaintiff's reported daily activities, his apparent continuation of work, his beneficial

course of treatment, his refusal to follow prescribed treatment for depression, and his situational depression.  (Tr. at 17.)

Based on this RFC, the ALJ found that plaintiff could not return to his past work as a car wholesaler or brick mason.  (Tr. at 17.)  However,  relying on the VE's testimony, the ALJ concluded at step five that plaintiff could perform other jobs, including assembler of small parts, assembly/machine tender, and order clerk.  (Tr. at 17-18.)  She therefore found plaintiff not disabled and denied his applications.  (Tr. at 18-19.)

### III.  DISCUSSION

Plaintiff argues that the ALJ erred in evaluating the credibility of his testimony and Dr. Holcomb's treating source reports.   I address each argument in turn.

### A.    Credibility

#### 1.    Applicable Legal Standard

In assessing the credibility of a social security claimant's testimony, the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  SSR 96-7p. If the claimant suffers from no such impairment(s), or if the impairment(s) could not reasonably be expected to produce the claimant's pain or other symptoms, the symptoms cannot be found to affect his ability to work. SSR 96-7p.

If the ALJ finds that the claimant's impairment(s) could produce the symptoms alleged, she must then determine the extent to which the symptoms limit the claimant's ability to work. SSR 96-7p.  In making this determination, the ALJ may not discredit the claimant's statements based solely on a lack of support in the medical evidence.  Moss v. Astrue, 555 F.3d 556, 561

(7th Cir. 2009). Rather, the ALJ must consider the entire record, including the claimant's daily activities; the frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, for relief of symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. The ALJ must then provide "specific reasons" for the credibility determination, supported by the evidence and articulated in the decision. SSR 96-7p.

The reviewing court will give "an ALJ's credibility determination special, but not unlimited, deference." Shauger v. Astrue, No. 11-3232, 2012 WL 992100, at *4 (7th Cir. Mar. 22, 2012) (citing Jones v. Astrue, 623 F.3d 1155, 1160 (7th Cir. 2010); Villano, 556 F.3d at 562). The ALJ must consider the factors set forth in the regulations, id. (citing 20 C.F.R. § 404.1529(c); SSR 96-7p), and she must support the credibility findings with evidence in the record, id. (citing Villano, 556 F.3d at 562).

## 2. Analysis

### a. The ALJ's Use of a "Template" Credibility Finding

In the present case, after acknowledging the two-step test from SSR 96-7p, the ALJ started her credibility analysis with "hackneyed language seen universally in ALJ decisions," Shauger, 2012 WL 992100, at *4, stating:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity evaluation.

(Tr. at 14-15.) This language is apparently part of a "template" drafted by the Social Security

17

Administration for insertion into ALJ's opinions. Bjornson v. Astrue, 671 F.3d 640, 644-45 (7th Cir. 2012). The template is seriously flawed and its use should be discontinued. See, e.g., Martinez v. Astrue, 630 F.3d 693, 694 (7th Cir. 2011); Spiva, 628 F.3d at 348; Parker v. Astrue, 597 F.3d 920, 921-22 (7th Cir. 2010).

As the court explained in Bjornson, a case in which the ALJ employed language virtually identical to that quoted above, the most significant flaw in the template is that it gets things backwards. The assessment of a claimant's ability to work will often depend heavily on the credibility of his statements concerning the "intensity, persistence and limiting effects" of his symptoms, yet the template suggests that ability to work is determined first and is then used to determine the claimant's credibility. 671 F.3d at 645; see also Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783, 788 (7th Cir. 2003) ("[T]he apparently post-hoc statement turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the . . . credibility as an initial matter in order to come to a decision on the merits."). The template also violates the SSR 96-7p requirement that the ALJ specify which statements are credible and which are not, explaining why by reference to all of the pertinent factors set forth in the regulations. See Spiva, 628 F.3d at 348.

### b.  The ALJ's Additional Reasons

Use of the template may be deemed harmless if the ALJ goes on to provide sufficiently specific reasons, supported by the record, for the credibility determination. See Pfund v. Astrue, No. 10-C-1145, 2011 WL 3844155, at *14 (E.D. Wis. Aug. 26, 2011). The ALJ in this case apparently found plaintiff's testimony inconsistent with the medical evidence and his daily activities, but her analysis of these issues was flawed.

### i.    Medical Evidence

The ALJ appeared to find plaintiff's testimony inconsistent with the diagnostic testing, his course of treatment, and the physical examination findings.  (Tr. at 15.)  As indicated above, although a relevant consideration, objective medical evidence alone cannot form the basis for an adverse credibility finding.  Moss, 555 F.3d at 561.  Further, the ALJ's finding rested on a selective reading of the record.

The ALJ noted that after his 2006 car accident, plaintiff "was diagnosed with merely an acute lumbar strain."  (Tr. at 15.)  Despite that "minimal diagnosis," he subsequently complained of worsening pain, undergoing a number of diagnostic evaluations and modes of treatment.  (Tr. at 15.)  The ALJ failed to appreciate that plaintiff's condition may have progressed beyond that initial diagnosis, requiring the extensive course of treatment described above.  As the Seventh Circuit has noted, it is improbable that a claimant would undergo extensive pain treatment procedures, including the use of strong drugs such as morphine and methadone, in addition to physical therapy, chiropractic, and epidural injections, "merely in order to strengthen the credibility of [his] complaints of pain and so increase [his] chances of obtaining disability benefits."  Carradine v. Barnhart, 360 F.3d 751, 755 (7th Cir. 2004).  That plaintiff's doctors would continued to prescribe such treatment, despite the "minimal" diagnosis, suggests that they "were behaving unprofessionally," id., an inference not supported by the record.[3]

---

[3]The ALJ also failed to specifically address medication side effects in considering plaintiff's credibility.  Plaintiff testified that his pain pills made him drowsy and affected his concentration (Tr. at 45), concerns he also shared with his doctors (Tr. at 625, 627).  The ALJ cited medication side effects as a basis for finding moderate limitations in concentration, persistence, and pace (Tr. at 13), but she did not consider such effects in evaluating the credibility of plaintiff's testimony.

Regarding the diagnostic testing, the ALJ noted that plaintiff's cervical scans generally revealed minimal degenerative changes.  (Tr. at 15.)  However, as plaintiff testified at the hearing, his lumbar spine, rather than his neck, constituted the primary basis for his disability claim.  (Tr. at 48.)  Plaintiff's April 16, 2009 lumbar MRI revealed a mild to moderate sized posterior disc bulge, with a visible left paracentral annular tear/fissure, at L5-S1.  (Tr. at 589.) His September 3, 2009 discogram revealed a Dallas grade 4 to 5 tear at the L5-S1 level.  (Tr. at 649.)  The ALJ mentioned the discogram (Tr. at 15) but failed to explain how these lumbar diagnostic findings supported her conclusion.[4]

In discussing plaintiff's course of treatment, the ALJ noted that plaintiff discharged from physical therapy in the fall of 2007 after missing three sessions, admitting improvement in his symptoms.  (Tr. at 15.)  Again, however, this therapy pertained to plaintiff's cervical condition. (Tr. at 597-98, 601, 608.)  The ALJ noted that the chiropractic care notes indicated that in June 2007 plaintiff's "low back pain was resolved.  Nevertheless, he subsequently denied any significant relief from any form of treatment and now desires to undergo surgical intervention, but has been unable to locate a surgeon willing to perform back surgery." (Tr. at 15.)  It is true that on June 13, 2007, plaintiff told Dr. Siegel that he had been feeling great since his last treatment, rating his pain 0/10.  (Tr. at 266.)  However, the ALJ ignored the fact that plaintiff suffered a severe recurrence of pain the following month (Tr. at 255-56, 260-264, 410-11, 761-62), resulting in his referral to orthopedist Dr. Perlewitz in August 2007, followed by another round of physical therapy (Tr. at 249, 252-53, 255-56).  To the extent that the ALJ may have suggested that plaintiff could not find a back surgeon because his condition did not warrant

---

[4]A Grade 5 tear appears to be the most serious on the Dallas scale.

surgery, the record does not support such an inference; plaintiff testified that he had not undergone surgery because of insurance issues and his pending lawsuit. (Tr. at 46-47; see also Tr. at 626, where plaintiff reported the same to Dr. Holcomb.) The record also contains evidence that plaintiff's insurance company canceled his low back therapy in November 2007. (Tr. at 235.) Under SSR 96-7p, the "adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." "Lack of health insurance or an inability to afford health care are bona fide reasons for not seeking medical treatment for a condition." Hughes v. Astrue, No. 10 C 4912, 2011 WL 6225382, at *15 (N.D. Ill. Dec. 7, 2011).

Regarding the physical exam findings, the ALJ again significantly relied on exams of the cervical spine. Exams of plaintiff's lumbar spine, as the ALJ conceded, revealed limited range of motion and tenderness on palpation. (Tr. at 15.) For instance, on September 22, 2009, Dr. Holcomb noted that plaintiff could extend his back no more than 5 degrees and flex about 45 degrees. (Tr. at 645.) On December 29, 2009, Dr. Holcomb noted: "He has careful gait with pain behavior that is consistent, including when I watch him in the parking lot." (Tr. at 635-36.)

In sum, the ALJ's credibility finding cannot be sustained based on the objective medical evidence set forth in her decision.

### ii.      Daily Activities

The ALJ also pointed to "activities and statements of the claimant that undermine his credibility." (Tr. at 16.) For example, when plaintiff sought treatment for neck pain in February 2009, he told the provider "that he is a car wholesaler by occupation." (Tr. at 16.) The ALJ did

21

not specify the provider to whom plaintiff made this statement, but she likely meant Dr. Kirk. (See Tr. at 677.)  It is true that Dr. Kirk's February 2009 notes list plaintiff's occupation as "wholesaler of cars," but all of Dr. Kirk's notes appear to contain this annotation.  (Tr. at 305-96, 677-83.)  The ALJ pointed to nothing in these records indicating that plaintiff was then actually engaged in this occupation, and such a finding would be inconsistent with her previous conclusion that plaintiff had not engaged in SGA since his disability onset date.[5]

The ALJ further stated that: "In June 2009, the claimant contacted his treating physician seeking an updated work restriction to give to 'his job.'" (Tr. at 16.)  This appears to be a reference to a June 9, 2009 note regarding a telephone message defendant left for Dr. Singhal. (Tr. at 665, "Needs an update of his work restrictions that he can give to his job.")  According to the note, plaintiff was apparently told "to FU with Dr. Singhal."  (Tr. at 665.)  Nothing in this note – which, again, appears to reflect a message taken down by a nurse or receptionist – indicates that plaintiff was then employed in any capacity.  Further, the record indicates that from 2000 to 2006, plaintiff was self-employed (Tr. at 42), so to the extent that the ALJ construed the note as requesting a work slip for plaintiff to give to some employer it made little sense.

Finally, the ALJ noted that in June 2009 plaintiff told his therapist:

> that his daily activities included working on cars, doing yard work, and working on the roof of his home.   The evidence indicates that in July 2009, he participated in a car show.  Most importantly, the claimant has admitted that he tries to remain active and busy because he is then less inclined to focus on pain.

(Tr. at 16.)  As the Seventh Circuit has repeatedly stated, while daily activities are relevant to

---

[5]It would also be inconsistent with her step four determination that he could not return to past work.

the credibility determination, ALJs may not place undue weight on such activities or ignore the claimant's limitations in performing them.  See, e.g., Bjornson, 671 F.3d at 647 ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer.  The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."); Jelinek, 662 F.3d at 812 ("An ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence.") (internal citation omitted).  Here, the therapist's note to which the ALJ appeared to refer reads, in full: "He's working on cars, yard, roof as pain allows."  (Tr. at 811, emphasis added.)  An ALJ may not ignore such qualifiers on a person's activities.  E.g., Moss, 555 F.3d at 562; Craft, 539 F.3d at 680; Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006); Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).[6]  Similarly, while plaintiff admitted going to some cars shows, he testified that he used a golf cart to get around because of his limited ability to walk.  (Tr. at 51, 57.)  The ALJ provided no explanation as to how plaintiff's ability to sporadically attend these shows cast doubt on his claim that he lacked the ability to work full-time due to pain or other limitations.  Nor did the ALJ explain why plaintiff's desire to remain active and busy cast doubt on his claim

---

[6]Dr. Kirk's notes contain references to plaintiff sanding cars, but such activity was generally accompanied by a worsening of plaintiff's condition.  (Tr. at 313, 316; see also Tr. at 373 & 728, an October 29, 2008, note, with plaintiff reporting terrible pain after working on his grandparents' house getting it ready for winter.)  Earlier in her decision, the ALJ listed some of plaintiff's other daily activities, but this was in the context of considering the B criteria of the mental health Listings.  (Tr. at 13.)  The ALJ did not relate these activities to plaintiff's credibility.  Further, plaintiff testified that while he did some household chores on a "good day," his girlfriend and children provided significant assistance with the housework.  (Tr. at 53.)

23

of work-disabling pain.  See Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.").

The ALJ concluded the RFC section of her decision by stating:

> The claimant's testimony regarding the severity or frequency of his symptoms is not fully credible or supportive of any greater limitations or restrictions than those included in the residual functional capacity set forth in this decision. Consequently, there is no basis for finding that the claimant has suffered debilitating pain or any other symptoms that would further reduce the residual functional capacity described above at any time through the date of this decision.

(Tr. at 17.)  This adds little or nothing to the analysis.  It continues to compare plaintiff's testimony to the pre-determined RFC; it offers no clue as to which statements are credible and which are not; and it fails to explain what exactly "not fully" credible is meant to signify.  See Spiva, 628 F.3d at 648; Parker, 597 F.3d at 922.  Therefore, the decision must be reversed and the matter remanded for reconsideration of plaintiff's credibility.

## B.    Treating Source Report

### 1.    Applicable Legal Standard

The ALJ must give a social security claimant's treating physician's opinion "controlling weight" if it is "well-supported" and "not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2); see also Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011).  If the ALJ finds that the opinion fails to meet the standard for controlling weight, she must determine what value the assessment does merit, Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011), considering the length, nature, and extent of the treatment relationship; the frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the physician's opinion, 20 C.F.R. § 404.1527(c); Moss, 555

F.3d at 561. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p. Regardless of the weight she elects to given the opinion, the ALJ must always offer "good reasons" for her decision. 20 C.F.R. § 404.1527(c)(2); see also Punzio, 630 F.3d at 710 ("[W]henever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision.").

**2. Analysis**

In the present case, the ALJ gave Dr. Holcomb's August 2010 report "little weight" because "it is not well-supported by the evidence." (Tr. at 16.) The ALJ stated that the physical examinations, consistently within normal limits, did not support the indicated limitations. (Tr. at 16.) The ALJ further noted that in his July 2010 report Dr. Holcomb stated that plaintiff had been unable to work since December 2006, was having financial difficulty, and thus requested an expedited hearing on his disability claim. (Tr. at 16-17.) The ALJ assigned this report little weight, as it did not include a function-by-function assessment but rather focused on plaintiff's financial needs. (Tr. at 17.)

In addition to skipping over several of the pertinent factors in 20 C.F.R. § 404.1527(c), this determination suffers from many of the same flaws discussed above. Plaintiff's lumbar spine exams were not, in fact, consistently within normal limits, and the diagnostic tests revealed significant problems. The ALJ also overlooked the extensive course of treatment Dr. Holcomb and the other providers prescribed, including strong pain medications, therapy, chiropractic, and injections. Dr. Holcomb's treatment notes consistently record plaintiff's complaints of disabling pain and limitation of function, and the ALJ pointed to no inconsistencies in the notes; nor did she cite contrary medical evidence or opinion. The

Commissioner notes that Dr. Holcomb's report was contrary to the reports from Drs. Baumblatt and Khorshidi, but the ALJ did not cite those reports so I may not rely on them to uphold the decision. See Jelinek, 662 F.3d at 811 ("We limit our review to the reasons articulated by the ALJ in the written decision.").

The ALJ gave less weight to the July 2010 report because it was motivated by plaintiff's financial need, but this note was written in an attempt to get plaintiff an expedited hearing; it is hard to see how reference to plaintiff's financial need in that context should cast doubt on the other opinions referenced in the letter. See SSR 96-2p (explaining that a single treating source may provide medical opinions about several issues, and it may be necessary to address separately each medical opinion from a single source). Moreover, this provides no basis for rejecting the September 2009 and August 2010 reports. The matter must be remanded for reconsideration of Dr. Holcomb's opinions.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision, pursuant to § 405(g), sentence four. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 2nd day of May, 2012.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

26